UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

LET THIS BE FILED

Signature _____

Date 7/1/19

**Wilfred Michael Stark III**

*Plaintiff,*

v.                                    Civil Action No. 19-1010

**Heather Swift,** *et al.*

*Defendants*

### REPLY TO DEFENDANTS' MOTIONS TO DISMISS

Defendants Ed Gillespie, et al. seek to hold Mr. Stark to a higher standard of pleaing owing to Mr. Stark's status as a licensed attorney. Precisely because Stark is not and has never been a *practicing* attorney, because he does not have convenient access to legal research libraries during their operating hours, and because he is otherwise occupied with supporting his family at a full-time hourly job, Plaintiff Stark has not been able to marshal his decade-old legal education to bring its full force (such as it is) to bear on these proceedings. Although Stark has maintained his Maryland bar license by paying bar dues and other necessary fees, Plaintiff Stark has done nothing in then ten years since graduating law school to advance a career as an attorney. I have never entered an appearance before any court, I have never submitted a motion, I have never drafted or reviewed a contract for a client, and in fact have never done any billable legal work. Indeed, Plaintiff Stark did not even pursue a summer job while in law school, choosing instead to pursue a career as a political journalist. Of course, defendant's attorneys practice

RECEIVED
JUN 27 2019
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

law full-time at some of the most prestigious law firms in the United States. Suggesting Plaintiff Stark is an attorney because he attended law school and maintains his license out of a sense of prudence is not dissimilar to putting Aaron, his 11 year-old little-leaguer son in a batter's box to face Max Scherzer and suggesting because he knows "three strikes and y'er out" and carries bat in his hands, he's a baseball player.

With that said, if this court allows this action to advance past the pleading stages, I intend to hire counsel to pursue the matter to its conclusion.

I next turn to the substance of the defendant's responses which primarily contest my jurisdiction over them for a variety of reasons. Again, I am not standing on steady ground because I am not a practicing attorney, but at the outset it is my belief that I easily establish jurisdiction over each of the defendants by alleging damages within the District of Columbia. To the extent the defendant's conspiracy caused The Washington Post, Twitter and many other media organizations to publish and link to disparaging articles founded on defendant's untruthful accusations that I violently assaulted women, and to the extent those articles were read by potential employers within the District of Columbia, and to the extent employers would not consider hiring plaintiff Stark after reading the articles arising out of the fabricated accusations leveled by the defendants and their conspirators, Stark was harmed within the District of Columbia. Plaintiff Stark has been told by several influential (and empathetic) leaders of Democratic organizations that in the #MeToo era, organizations just cannot risk hiring someone with an "internet history" of physical abuse toward women.

In addition to the jurisdictional arguments asserted by defendants, the plausibility of my claims – especially that of conspiracy – is attacked as implausible or too speculative to survive. I suppose that is a matter for the court to decide. All I can do is present what I know in a more comprehensive manner, and

then pray the court allow the truth to be discovered. To the extent my evidence points to ghosts and mirages, I am happy to apologize to those encumbered with an unwarranted burden.

But this much Plaintiff Stark knows...

As the morning of October 28, 2017 dawned, Plaintiff W. Michael Stark thought about his reputation not at all. Why should he have? He was a graduate of Rensselaer Polytechnic University and the University of Virginia School of law, had been happily married for almost 15 years, had two happy and wonderful young children, and for more than ten years he had established a reputation for regularly producing unassailable high-impact accountability journalism. And in September, 2017, Stark's reputation redounded to his benefit when he was approached by ShareBlue (a subsidiary of American Bridge, the largest opposition research SuperPAC in the United States) to establish a beat covering the Ed Gillespie campaign for governor of Virginia.

Less than one year later, on October 17, 2018, Mr. Stark – through no fault of his own – had been arrested and jailed three times, had been falsely accused by three Republican women of physical assault, and had lost his job. In each of the four incidents (one of the assault accusations did not result in arrest), the false accusations were published to social media, shared with conservative websites, and widely broadcast across the national print, internet, radio and television media.

And in each of the four incidents, incontrovertible video evidence exists demonstrating the false and malicious nature of the accusations.

Defendants would have the court believe that each of the four incidents arose independently and in the absence of any conspiracy; that these allegations, in the words of one counsel, amount to a mere "laundry list of political vendettas," each of them independent of the others.

This court should not blinker reality; nor should it should abandon common sense.

These are the facts:

In September 2017, Plaintiff W. Michael Stark was hired by a subsidiary of the largest Democratic opposition research SuperPAC in the United States, American Bridge[1]. American Bridge is a powerful and feared opponent of Republican campaign professionals (and the GOP rank and file). Its prominence, ingenuity and its long record of effectiveness ensures that the organization is closely monitored by its Republican opponents.

American Bridge's "bread and butter" has always been its large fleet of political trackers[2]. Traditionally, trackers follow elected officials and candidates for office, recording their movements and utterances to video, with the goal of capturing inconsistent messaging, a gaffe, or some other sort of campaign-shaping mistake. By 2017 trackers had become *de rigueur* on the both sides of the political campaign trail.

After Donald Trump won the 2016 Presidential election, American Bridge did some proverbial soul-searching and decided a change of direction was required. Although Bridge trackers had recorded thousands and thousands of half-truths, fabrications, and outright lies, too many passed without consequence. American Bridge decided to hire a nakedly partisan reporter to hold politicians accountable for their statements.

Plaintiff W. Michael Stark was the reporter hired to prove the concept. Defendant Ed Gillespie's campaign for governor was chosen as a pilot project of the new initiative.

To begin the project, Stark, as an investigative journalist, attended a private fundraiser to record Gillespie's stump speech. There, indistinguishable from any other guest, he made small talk with the

---

[1] https://www.usatoday.com/story/opinion/2019/06/14/donald-trump-foreign-dirt-illegal-not-opposition-research-column/1445246001/
[2] https://www.npr.org/2012/04/23/151060718/behind-the-scene-to-the-next-debacles-video-trackers

candidate. The small campaign donation required to attend the event evidently paid off a few weeks later when Stark attended a Gillespie town hall and asked him to "walk me through the moral calculus you put yourself through when you decided it was acceptable to lobby for tobacco companies."[3]

At the next campaign event, and at every event held at a private facility thereafter, the Gillespie campaign staff had Stark removed from the hosting venue.

This did not dissuade Stark from doing his job. Accepting that he would be banned from private venues, Stark began arriving at events early to record Gillespie answering questions as he traversed the parking lot on his way into the events. Then, before he could be asked to leave the premises (and risk a trespass charge for non-compliance), Stark would leave of his own volition, only to return an hour or so later as the event was due to end, where he would once again ask Gillespie "accountability questions".[4]

This routine continued at scores of campaign events; eventually Stark was told he had earned the title "Most Hated" among Gillespie and his campaign staff.

Before October 28, 2017, Stark attended a single campaign event in a public venue where the Gillespie campaign had no right or opportunity to request Stark's removal. The event occurred in Richmond, Virginia, was hosted by an urban radio station, RadioOne, and was held before a mostly black audience[5]. At the conclusion of the event, Stark stationed himself at Gillespie's elbow as he worked the crowd. Given that an important topic discussed among the candidates was the confederate monuments controversy and the Charlottesville "Unite the Right" rally where a white supremacist murdered anti-racist counter-protester, Heather Heyer. While Gillespie shook hands and kissed babies, Stark

---

[3] https://www.washingtonpost.com/local/virginia-politics/can-a-career-tactician-navigate-trump-and-a-gop-civil-war-and-win-virginia/2017/10/25/813769a8-a790-11e7-850e-2bdd1236be5d_story.html
[4] For example, after the Las Vegas shooting Stark asked Gillespie why he would not release his NRA questionnaire and tell Virginians what he promised to the nation's largest gun-rights group: https://shareblue.com/virginia-gop-candidate-haunted-by-nra-endorsement-after-vegas-massacre/
[5] https://kissrichmond.com/2902410/reserve-seats-for-the-your-community-gubernatorial-forum-here/

continually asked him why he kept former Governor and United States Senator George Allen on his campaign given the fact that Allen kept a Confederate Flag and a noose in his office, was reported to have constantly used the n-word, and refused to sign a bill memorializing Martin Luther King's birthday. Although Gillespie studiously ignored Stark's queries, Stark politely continued his questioning without pause until Gillespie fled the event[6].

Stark's willingness to persist in his accountability reporting is admittedly unusual. Stark asks the court to take judicial notice of the fact that most political interviews are generally deferential, with the reporter taking on the role of supplicant and the politician taking on a more authoritative role. Stark, honoring the Supreme Court's understanding of the importance of a free press[7], takes a different approach insomuch as he insists that politicians work for the people and owe them the minimal respect of honest responses to honest questions.

And so it came to be that on October 28, 2017, in the moments before Ed Gillespie was to walk in a parade through one of the most diverse neighborhoods in Virginia, someone from his campaign vehicle reported that someone was "lingering around their campaign vehicle", "trying to locate their candidate" and that they were "afraid of him" and "worried that he might get violent"[8].

Of course, the campaign staff inside the vehicle knew exactly who Plaintiff Stark was, they were only afraid of him in the sense that he was likely to ask Gillespie unwelcome questions as he walked the parade route, and they had no fear of Stark becoming violent. Moreover, the idea that anyone from the campaign vehicle would take such measures against Stark without the explicit approval of the candidate

---

[6] https://shareblue.com/virginia-republican-awkwardly-ignores-questions-of-why-he-put-infamous-racist-on-his-campaign/

[7] *Associated Press v. United States*, 326 U.S. 1 (1945): "The First Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Freedom to publish means freedom for all, and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not."

[8] See attached document, "Commonwealth V. Stark" transcript, case no. GC17216111-00

– who was in the same campaign vehicle at the time the call was made – stretches credulity beyond any reasonable bounds.

The untruthful statements catalyzed a series of unfortunate events that began when a policeman ordered Stark to leave the occupants of the Gillespie campaign vehicle alone. Stark, presented with an opportunity to publicly question Gillespie for an extended period, was not so easily dissuaded. Stark identified himself as a reporter and told the policeman he would have to arrest him to keep him from doing his job. The policeman told Stark not to "f***" with him, Stark replied in kind, and within moments found himself handcuffed beneath a pile of policeman[9].

Plaintiff Stark avers that the Gillespie campaign statements may or may not be defamatory and that they may or may not be time-barred. That will be a matter to be determined by Stark's attorney, opposing counsel, and the court after further facts are developed. For now, however, at a minimum, they establish that Ed Gillespie knew who W. Michael Stark was, and that Mr. Gillespie was hostile to Stark's interests in reporting on his campaign (and presumably, later, that of other Republicans), and that Mr. Gillespie, at a minimum, constructively participated in the events leading to Mr. Stark's arrest on October 28, 2017.

Upon the conclusion of the 2017 election, Stark's contract with ShareBlue expired. Less than two months later he was hired by American Bridge as a reporter to help launch their new initiative, the web-based news site, American Ledger. This role expanded Stark's beat to covering all prominent Republicans and Republican allies, with his day-to-day coverage focused on Republican representatives and Senators on Capitol Hill.

---

[9] https://www.buzzfeednews.com/article/juliareinstein/video-shows-police-slamming-reporter-who-was-tracking-gop

Stark's reporting style remained unchanged. Although cordial, honest and respectful, Stark was tasked with pressing elected Republican on issues they would have preferred not address. And almost immediately his work was impactful, with his videos garnering millions of views on Facebook, Twitter and YouTube[10].

Stark was remarkably forthcoming with his Republican adversaries. He often introduced himself to Representatives and Senators with the words, "Hi, I'm Mike Stark with American Bridge, the Democratic SuperPAC. I'm here to report on Republicans and hopefully facilitate your career transition to K-Street..." Most often the opening engendered a chuckle and a bit of engagement. But one Representative did not appreciate the candor. Stark was explicitly told that "the Committees" had an agreement that they would not subject each other's members to such "harassment" on the Hill. Stark reiterated that he was with American Bridge (and not with any Committee). The Republican representative replied that it didn't matter, that I was breaking the spirit of the Committee's agreement, and that I should watch myself should I persist.

Stark interpreted this as a threat from someone representing one of the national Republican Committees and reported it to his supervisors at American Bridge. A few months later, Stark encountered the same Republican representative among a crowd of other representatives; a substantially similar exchange occurred, except that instead of a veiled threat, the Congressman merely told Stark and the other congressmen that there was an agreement between the Committees and Stark should not be "doing this".

In addition to the veiled threat, the National Republican Congressional Committee (NRCC) began deploying "minders" – operatives assigned to follow Stark on the House of Representatives' side of the Capitol to warn members off engaging. When that failed to deter Stark, the NRCC began assigning

---

[10] https://twitter.com/nowthisnews/status/964538131075678209?lang=en

several operatives to Stark, with each of them carrying an oversized campaign-style sign featuring Stark's mugshot from his Virginia arrest. This continued even after Stark was acquitted of all charges in exchange for disclaiming any actions against Fairfax County or any of its agents, including the police.

At the same time, some Republican representatives started asking Stark some pointed questions of their own. One memorable question had to do with Stark's arrest and driving while intoxicated charge while sleeping along the side of a highway. That never happened to Plaintiff Wilfred Michael Stark III, but may have happened to his estranged father, Wilfred Michael Stark Jr. I raise this here because it is additional circumstantial evidence that the highest levels of American Republican infrastructure were searching for ways to discredit and defame Stark.

Meanwhile, on the other side of the Capitol, the Chair of the National Republican Senatorial Committee (NRSC), Senator Corey Gardner, was fully aware of American Bridge's new initiative and Plaintiff Stark's efforts. Plaintiff Stark knows this because Senator Gardner regularly replied to Stark's questions with remarks disparaging Stark's employer. Although the NRSC was less openly hostile to Stark's presence, individual Senators – including Senator Gardner – repeatedly reported Stark to the Capitol Police for merely asking questions. Although never arrested, Stark was routinely detained for 20-30 minutes while the police checked his credentials. This had the practical impact of preventing Stark from doing his job during the crucial periods when votes were being called and Senators were traversing the corridors between their offices and the Capitol voting chamber. It also created an unnecessarily hostile work environment that harmed Stark's reputation with the police and his peers in the rest of the media[11,12].

By March of 2018, the new American Bridge effort to hold Republicans accountable was exceeding expectations, and Stark was sent to cover the Conservative Political Action Conference (CPAC) at

---

[11] https://www.rollcall.com/news/congress/capitol-police-crackdown-press-escalates-physical-altercation/
[12] https://www.dailykos.com/stories/2019/2/17/1835349/-Capitol-Police-rough-up-pregnant-reporter-after-Senator-John-Kennedy-complains-about-my-question

National Harbor in Maryland. Tasked with asking Republicans about the #MeToo movement and President Trump, Stark recorded Ronna Romney McDaniel, the Chairperson of the Republican National Committee, and Kayleigh McEnany, the Committee's spokesperson, evading the question[13]. Later, when asking defendant James Damore[14] a similar question, Damore swatted at Stark's camera and falsely accused him of assaulting co-defendant Christie-Lee McNally, Executive Director of Free Our Internet[15].

When Stark continued his questioning, McNally sought protection from police. Although the police saw nothing of concern, an event executive witnessed the contretemps and revoked Stark's credentials.

Interestingly, the fabricated Damore accusation occurred the day after Stark initially requested an interview. At that time, McNally provided Stark with Chad Wilkinson's business card, instructing that Stark should request an interview. Stark received no response to his telephone and email requests. (Similarly, Damore, McNally and Wilkinson have each avoided or ignored legal service in the present case; Wilkinson went so far as to block Stark on Twitter when asked how he could best be served.)

The false and defamatory accusation was published to the police by Christie-Lee McNally, conveyed to Chad Wilkinson by either or both of McNally and Damore, and subsequently published to twitter by Wilkinson. Plaintiff Stark does not believe James Damore happened upon the accusation without coaching from Wilkinson and McNally. Stark knows from many years of experience studying, writing about and interacting with the extreme right that Saul Alinsky's *Rules for Radicals* is fetishized by conservative activists. His fourth rule, "Make the enemy live up to their own book of rules," has become a talisman of sorts and was applicable here: As a Democratic reporter, I was perceived as their "enemy". Importantly, at the time, #BelieveWomen was a powerful complement to the contemporaneous

---

[13] https://www.youtube.com/watch?v=SKLVU2c3tIY
[14] Damore is famous as the Google employee that was fired for internally distributing an anti-diversity screed that suggested women were ill-suited to technical careers https://gizmodo.com/google-fails-to-have-lawsuit-originally-brought-by-jame-1835351078
[15] https://gizmodo.com/fake-fcc-comments-linked-to-ex-trump-campaign-directors-1832233664

#MeToo movement. I was asking questions about #MeToo. By accusing me of assaulting women, and holding those of us that cared about the #MeToo movement to the #BelieveWomen standard we demanded, Damore, McNally and Wilkinson successfully "hacked" my efforts to report on Damore's attitude toward women.

It may worth specifically mentioning the details contained within the link to footnote 14 insomuch as both McNally and Wilkinson worked for a group that apparently defrauded the Federal Communications Commission by causing millions of fraudulent public comments to be submitted. In addition to being the former Director of the State of Maine's Donald Trump organization, Christie-Lee McNally serves as Free Our Internet's Executive Director; Wilkinson served as spokesperson and Communications Director after several years as a Breitbart.com spokesperson, and as a right-wing talk radio producer. These senior Republican operatives are not reputable people that can be relied upon for their honesty. Indeed, several investigative reporters have connected their work at Free Our Internet to noted Republican dirty-trickster Roger Stone.

About two weeks after suffering the false accusation that he assaulted Christie-Lee McNally – the first accusation that he assaulted a woman – Stark's assignment required him to cover Senate testimony from then-Interior Secretary Ryan Zinke. At the conclusion of the hearing, Stark approached the Secretary with questions. His staff, including Heather Swift, reacted with alarm and shouted Stark's questions down. A passing policeman witnessed the commotion and separated Stark from the Secretary's coterie, allowing him to board an elevator without facing further questioning.

The suddenness of the Secretary's staff reaction suggests they were prepared for Stark, recognized him in the hearing room, and had *a priori* strategized a plan for dealing with his questions. Of course, this is unlikely to have occurred without some sort of communication among interested parties. And considering that at the time, many of the damning video interviews of Republicans Stark was publishing

were garnering between tens of thousands and ten million views, and considering that this was a new project launched by American Bridge... this is exactly when one might presume communications would be exchanged among Republican activists and professionals in contemplation of what to do about the new tactical threat to their political interests.

Two days after the Senate testimony, Secretary Zinke appeared before the House Committee on Natural Resources. Stark was in the audience. At the conclusion f his testimony, defendant Heather Swift assaulted Stark by intentionally throwing her hip into Stark's. She then exclaimed, "Stop pushing!" Stark was arrested moments later. Defendants Heather Swift, Tyler Dever, and Amanda Kaster-Averill each published EXTRAORDINARILY false and defamatory statements – under penalty of perjury – to the investigating police. The outrageously egregious nature of the defamatory statements is readily proven by their utter incompatibility with the video evidence recorded by Stark's GoPro camera.

While Stark was jailed and unable to defend himself, defendant Swift provided false and defamatory statements to several conservative news outlets. Several media organizations quoted her statements and published stories presenting her false allegations[16].

Importantly, I was found not guilty after trial, with Judge Maurice A. Ross finding my testimony "highly credible."[17]

Recall that this was just slightly more than two weeks after Stark had initially been falsely accused of assaulting a woman (Christie-Lee McNally). Here, again, Swift and her confederates falsely accused Stark of... assaulting a woman. Once again, the lying conspirators leveraged the #MeToo movement insomuch as Swift's statement to the press included the following coda: "Democrats claim to support women but

---

[16] A typical example: https://www.cnn.com/2018/03/20/politics/zinke-spokeswoman-assault-heather-swift/index.html

[17] https://www.eenews.net/stories/1060096277

they allow their operatives to assault women. They need to immediately denounce this type of violent behavior."[18]

The United States, in defending Swift, Dever and Kaster relies on a certification that the intentional torts took place in the performance of their duties as United States employees. I expect my attorney to contest that certification because it is preposterous that any one of their duties could possibly include perjuring themselves to affect the arrest of a reporter engaged in Constitutionally protected First Amendment activities. In the alternative, upon engagement, my attorney may seek leave to amend the pleading for these defendants to substitute and assert §1983 claims.

American Bridge suspended Stark while they investigated the allegations against him. The police had seized his GoPro; when it was returned and the video was reviewed by his supervisors, Stark returned to work.

Simultaneously, the 2018 mid-term elections were expected to be disastrous for Republicans. Under these conditions, it would be unreasonable to assume that the GOP electoral infrastructure was not focused on using any available means to minimize their expected losses. Unfortunately for them, once again, the new American Bridge project was providing outsized returns. Stark's work continued to earn substantial media; one of his videos provided the cornerstone of a The Late Show with Stephen Colbert opening monologue.

Republican (and only Republican) Senators continued to complain to Capitol Police that Stark was "harassing" them. Stark continued to be unnecessarily detained. NRCC operatives continued to follow Stark around the Capitol grounds with large signs featuring Stark's mugshot.

---

[18] https://dailycaller.com/2018/03/16/trump-admin-official-assaulted-speaks-out/

allegedly assaulting them). Taken together, the conspiracy to affect Stark's arrests and to disparage him in the national political press while he was jailed amount to a campaign of constructive defamation. Defendants knew that such a course of action would yield results that by their very nature would be inherently defamatory.

In short, this court should use commonsense as its touchstone. Four (or more) videos of four incidents exist that demonstrate the falsity of Defendant's charges that resulted in Plaintiff's arrest (and in the Las Vegas case, video exists that capture them in the act of conspiring insomuch as they coordinated their statements to police). The result of the three arrests is that Plaintiff Stark's reputation has been harmed beyond recognition.

Politics is not beanbag, but civilization requires some degree of decency and fairness. And although Defendants aver some of Plaintiff Stark's complaints are time-barred, there is no reason to believe that the organizations and individuals involved have suspended their ongoing conspiracy.

As plaintiff has shared with each of the opposing counsels, what Stark wants is for the fact to come out and a semblance of justice to prevail. Nothing in this response or the original complaint is fabricated; in fact, none of the defendants have denied any of the asserted facts. Instead they rely on specious jurisdictional arguments, spurious pleading deficiencies, and technical immunity claims. Dismissing any defendants from this action without first developing a factual record or subjecting their defenses to the scrutiny of a competent practicing attorney would be patently unjust.

## *Appendix*

VIRGINIA: IN THE GENERAL DISTRICT COURT FOR FAIRFAX COUNTY COMMONWEALTH OF VIRGINIA,

PLAINTIFF, VS. CASE NO. GC17216111-00

MICHAEL STARK, DEFENDANT.

---

TRIAL BEFORE THE HONORABLE MARK SIMMONS

TUESDAY, FEBRUARY 13, 2018 1:12 P.M.

FAIRFAX COUNTY COURTHOUSE

4110 CHAIN BRIDGE ROAD

FAIRFAX, VIRGINIA 22030

Commonwealth vs Star Trial February 13, 2018 VR # 6956-1 Transcript

Testimony of Officer Lt. Massarro, pg 15:

17 WITNESS: Thank you, sir.

18 A. Ms. Reuss approached me and stated that the

19 Gillespie campaign had came to her and warned her

20 about a subject that was lingering about their

21 campaign vehicle and around, attempting to locate

22 their candidate. And that they were afraid of him,

23 and they were worried that he might get violent